COMMONWEALTH vs. RONALD A. X. STOKES.

No. 93-P-1490.

Suffolk. April 14, 1995. - July 19, 1995.

Present: JACOBS, GILLERMAN, & GREENBERG, JJ.

*Evidence*, Bias of government witness, Judicial discretion, Joint enterprise. *Witness*, Bias. *Practice, Criminal*, Cross-examination by prosecutor, Instructions to jury. *Joint Enterprise*.

At a criminal trial, the judge correctly excluded as evidence certain hearsay statements of an unavailable witness, proffered by the defendant to demonstrate alleged police bias against him, where the statements were not shown to be material to the issue of such alleged bias [759-761]; further, where the evidence was not competent, no constitutional right of the defendant to present evidence was implicated [761].

At a criminal trial, there was no error in the judge's refusal to strike certain of the prosecutor's questions to the defense expert as not based on the evidence, where the witness, in answering, had acquiesced in the factual premise of the questions. [762]

At a criminal trial, the evidence was sufficient to warrant the judge's instructing the jury on joint venture. [762-763]

INDICTMENTS found and returned in the Superior Court Department on December 27, 1990.

The cases were tried before *James D. McDaniel, Jr.*, J.

*Eric Brandt*, Committee for Public Counsel Services, for the defendant.

*Jane L. McDonough*, Assistant District Attorney, for the Commonwealth.

GILLERMAN, J. The defendant was convicted by a jury of two counts of assault and battery by means of a dangerous weapon, G. L. c. 265, § 15A, and one count of unlawfully carrying a firearm, G. L. c. 269, § 10(*a*).[1] On appeal, the

---

[1]The defendant was also indicted for murder in the first degree, G. L. c. 265, § 1, but was found not guilty on that indictment. The judge sentenced the defendant to three consecutive terms, totalling not less than

defendant claims that (1) the judge erroneously excluded statements of a percipient witness to the crime that supported the defendant's claim of police bias against him; (2) the prosecutor, during cross-examination of the defendant's forensic expert, made improper testimonial assertions; and (3) the judge's instructions on joint venture were not supported by the evidence. We affirm.

From the Commonwealth's evidence, the jury could have found the following facts. Shortly after 4:00 A.M. on December 6, 1990, Kenneth Pounds left his house at 323 Fuller Street in the Dorchester section of Boston to drive to work at the Polaroid Corporation in Norwood. As he walked toward his driveway, he saw two men standing on the opposite side of the road, about two houses down the street. Pounds, uncertain and suspicious, turned and started back to his house. At that moment, he heard one of the men say, "Let's get him." Pounds picked up his pace, called to his wife to open the door, and ran into his house just as the shooting started. Pounds was wounded in his right arm, as was his wife, Bettie. Once the front door was secured, Bettie called the police.

The Boston police officer who responded to the call found one Kenneth Wiggins dead in his automobile on Fuller Street from a gunshot wound to his back. Wiggins' companion, Sherry Parkman (the percipient witness referred to above), was not injured.

The principal issue at trial was the identification of the defendant as one of the two men involved in the shootings of Kenneth and Bettie Pounds. Kenneth Pounds testified that he "couldn't get a good description of [the men involved in the shootings]." They "appeared to be shorter than me.[2] . . . [I]t looked like they were wearing . . . light weight jackets." Bettie Pounds could only see that the assailant "had on dark clothes." Rufus Smalls, who lived next door to the Poundses, testified that he heard the gun shots. He went to his window,

twenty-three and one-half years and not more than twenty-five years, to be served from and after the sentence the defendant was already serving for violation of parole.

[2]Mr. Pounds testified that he is "about six feet, six one."

and, although he could not see either of the men's faces across the street, he was able to see that the two men were black and that one man was taller than the other, the taller one being about five feet six inches to five feet eight inches in height.

Officer Timothy Donovan and his partner, Officer James Naughton, were in their marked police car when they heard a call over the radio about a shooting at Fuller Street. They proceeded directly to that location. Officer Donovan saw a "female on the scene. We didn't get her name. We really didn't have time." Officer Donovan was told about Kenneth and Bettie Pounds, and he went to their home to help them.

Officer Michael Cox and his partner, Officer Craig Jones, were in an unmarked car, but in uniform, that evening. They were in the vicinity of Fuller Street about 4:00 A.M. when a man, wearing a Los Angeles Lakers' basketball team jacket, ran up to their vehicle and gave them some information about a shooting on Fuller Street. They proceeded toward Fuller Street, turned off their headlights, and went the wrong way down Fuller Street.

Officer Cox testified that he "noticed two males sitting on a motor vehicle at about 310 Fuller Street." Upon seeing the police, the two men began to run down a nearby alleyway. Officer Cox, with his gun in hand, pursued the men.

There was a street light at the head of the alleyway toward which the two men were running. Officer Cox observed that the two men were black, "and one was short and his hair was cut close, almost bald-headed." As the two men approached the alleyway, the shorter, almost bald man slipped on a patch of ice, fell to one knee, and dropped his firearm. He reached back to retrieve his firearm as Officer Cox, who had continued in fast pursuit, came to within five to seven or eight feet of the man. The officer's testimony continued: "At that point, when he slipped and fell, I stopped, I just basically froze and I had my gun drawn . . . . [I looked at him and] I could see, you know, really the shape of his head and basically — I mean, I looked right at his eyes. I mean, it startled me because that's never happened before. So I mean, I really fo-

cussed in extremely on him. He had an extremely short hair-cut. He was a black male and he was short.[3] And at this time I don't remember what clothes he had on. I just remember his face."

Continuing his chase of the suspect, but without success, Officer Cox eventually met another police cruiser being driven by Officer Painten. Cox told Painten that the suspect was "a black male, short, bald-headed." Cox returned to his cruiser and was soon joined by his partner, Officer Jones. Shortly thereafter, Officer Painten radioed that he had seen a possible suspect who fit the description that Cox had given earlier and that Painten and his suspect were at the nearby firehouse.

Cox and Jones proceeded to the firehouse. Cox testified that when they arrived he "knew right away, from a distance, that it looked very much like the same person." Cox then approached within one foot of the suspect. The suspect was "out of breath and sweating. . . . It was very cold [but] . . . he didn't have on . . . any kind of a winter coat." Cox identified him as the person he had just seen dropping his gun. Cox testified that he had "no doubt" that the defendant was the man he had seen with the gun. Cox made an in-court identification of the defendant.

Cox's partner, Officer Jones, had also pursued the suspects down the alley. He testified that the defendant was the one who had been holding the rifle and that he "had a very bald head. That really stuck out from everything." But, Jones also stated that he did not get a really good look at him. Further down the alley, Jones, with his flashlight in hand, saw the "shorter of the two gentlemen" with his ankle caught under a fence. The man got away, but when Jones was walking back to his cruiser, he saw in the rear of a nearby dump truck the same rifle he had seen in the defendant's hands.[4] Later, when he saw the defendant with Officer Painten, he,

---

[3]The defendant testified that he was five feet four inches to five feet five inches tall.

[4]There was no dispute that this was the rifle that killed Kenneth Wiggins and wounded Kenneth and Bettie Pounds.

too, had "no doubt" that this was the man with the gun. Jones also made an in-court identification of the defendant.

It was Officer Painten who apprehended the defendant. He had known the defendant when Painten was a guard at M.C.I., Walpole, and the defendant was an inmate. Painten first observed the defendant when he was walking "into the fire station parking lot." The defendant was "bald, had a very, very short haircut." Painten, once he realized he knew the suspect, said, "Ronald, what are you doing here?" The defendant answered, "I'm going to visit my girlfriend over in the projects." Painten then grabbed the defendant by the arm and radioed that he had the suspect. The defendant, who was "sweating profusely," complained about his ankle. Painten noticed that the defendant was wearing a light weight jacket and that his head was shaved. He had seen the defendant earlier at a Chinese restaurant, where the defendant had been wearing a heavy winter coat and brown ski cap. Painten handcuffed the defendant and put him in the police cruiser. On the way to the police station, the defendant explained that he was merely going to visit his mother at nearby Carney Hospital.[5]

The defendant testified; he denied that he was involved in the shooting incident. He testified that he woke up at approximately 4:00 A.M.; he was having an asthma attack. Because one of his brothers had his inhaler, he decided to walk to Carney Hospital. During his walk, he heard gunshots and saw "a whole lot of people exiting the street which I now know to be Fuller Street." He walked down Fuller Street to see what was going on, saw the fire station nearby, and decided to go there to get oxygen. He met up with Officer Painten in the parking lot. The defendant testified that he told Painten he was going to Carney Hospital and that right then he was about to go in the fire station "to see if I can get me some oxygen or something to see if they'll bring me to the hospital right up the street."

---

[5]The defendant makes no claim regarding his statements to the police, other than denying that he made them.

The slug found in Wiggins' body, the slugs found inside the home of the Poundses, and empty shell casings found outside the Poundses' house all were fired from the rifle — an AK-47 rifle — that was found in the rear of the dump truck. The forensic evidence revealed that the fingerprints found on the gun retrieved from the dump truck could not be matched to the defendant. The fibers found on the top of the fence over which the assailants climbed to make their escape did not match the defendant's clothing.

1. *Excluded statements.*

a. *The defendant's claim.* The defendant, who admitted to numerous felony convictions, argues that the judge erroneously excluded evidence of police bias. The proffered evidence consisted of out-of-court statements made by the percipient witness, Sherry Parkman.[6] The argument arises out of the following events at the trial.

Officer Timothy Donovan told the jury that there was a woman present at the scene of the shooting. The officer did not obtain her name. The defendant's counsel told the judge that the defendant would testify to a failed identification of the defendant by Parkman, the woman at the scene of the shooting,[7] and that Parkman's description of the two assailants — given in an interview conducted by the police four days after the shooting — was inconsistent with that given by the police. Further, the defendant asserted that there was an outstanding warrant for Parkman's arrest when she was interviewed by the police, yet the police failed to arrest and detain her, and that her unavailability at the trial to testify for the defendant may be attributed to that failure of the police.

From this proffered evidence, the defendant argued that Parkman was released because the police were biased against the defendant, who had a long record of convictions, and that

---

[6]At the trial, it was accepted that Parkman was unavailable despite diligent efforts to locate her by both parties.

[7]Defense counsel told the judge that "there will be evidence that a woman . . . at the scene was shown [the defendant] and said, 'That's not the guy.' "

the jury were deprived of the evidence of police bias in assessing the testimony of the police officers who identified the defendant as one of the assailants.

b. *Parkman's statements.*

(1) *The showup statement.* The defendant testified that a woman, whom the defendant believed was Sherry Parkman, appeared at the fire station with police officers after the defendant was detained there by Painten. The defendant was asked on direct examination what transpired at that point. The defendant answered that she said to the officer she was with, "No, no—"; at that point the prosecutor objected, and the judge instructed counsel, "No conversations about what the lady said." The defendant objected.

The defendant made no offer of proof at that time, but after the close of the evidence, during the course of the jury's deliberations, the defendant requested permission either to reopen the evidence or to put before the jury the fact that the defendant's complete answer would have been, "That's not the man. I told you what he looks like." (We shall refer to this statement as Parkman's "showup statement.") The judge denied the request, and the defendant objected. We will assume this is an adequate, albeit untimely, offer of proof for the purpose of preserving the point on appeal. No witness, other than the defendant, testified that he heard Parkman's alleged showup statement.

(2) *Parkman's interview by the police.* Officer Timothy Callahan, on voir dire, testified concerning the interview of Parkman four days after the shooting and the release of Parkman after the interview. The record includes a transcript of Parkman's interview. There are references in the transcript to a television news program that displayed the defendant — but not his face — as an assailant in the shooting incident. Parkman saw the program.

The transcript of the interview reveals that Callahan first asked Parkman to describe the assailants she saw the night of the shooting. As for the one with the weapon, she said, "I really didn't see his face. I saw his clothes. He had on a blue jacket with a white or kind of grayish looking cap. And the

one that was with him had on a sweatshirt with a hood, a hooded sweatshirt."

As for the person she saw on television, Parkman said that "he looked like— He was one of the people that was there. But he wasn't the one that was shooting." She said that she did not see the face of the person on television, but that that person was wearing the same clothing and was the same size and the same build as the second of the two persons she had seen that evening. In short, she "identified" the man she saw on television as one of the assailants.[8]

Further, regarding the interview, the defendant argues that Callahan admitted at the voir dire that he had access to the Boston police computer, which would have revealed the warrant for Parkman's arrest, and, despite Parkman's admission that she was on Fuller Street to purchase drugs the night of the shootings, he did not check the computer. He acknowledged that it would have been "police practice" to do so. Defense counsel asked Callahan about the language on warrants and Callahan testified that a warrant is an "order" and not a "request" to the police to arrest the named individual. After the interview, the police released Parkman. See note 6, *supra.*

At the conclusion of the voir dire, the judge ruled that Parkman's statements to the police were hearsay and were not admissible, and that Callahan could not be asked any questions regarding Parkman. The defendant objected to the rulings.

c. *Discussion.* The defendant, conceding the hearsay quality of the showup statement and the record of the police interview, argues that Parkman's statements should have been admitted, not for their truth, but to show police knowledge of their exculpatory content. See *Commonwealth* v. *Cohen,* 412 Mass. 375, 393 (1992). However, knowledge of a statement

---

[8]Mug shots showed the defendant wearing a blue jacket and blue jeans when he was arrested. The defendant's counsel, in a colloquy with the judge, stated that the television station tapes would show the defendant dressed in a sweatsuit at the time he appeared on television sometime later. The tapes were never made available to the judge.

is not admissible unless that knowledge is material to the issues being litigated. See Liacos, Massachusetts Evidence § 8.2.2, at 394 (6th ed. 1994) ("a party's knowledge of the contents of statements must be material for them to be admissible on this basis").

The defendant seeks to establish the required materiality by arguing that police knowledge of the showup statement, when considered together with the later police action in releasing Parkman after her interview with the police, during which she provided additional exculpatory evidence, reveals the police bias against the defendant. See *Commonwealth* v. *Miller*, 361 Mass. 644, 659 (1972) (state of police knowledge admissible for the limited purpose of showing "good cause" for subsequent undercover activity by the police). Had that evidence of police bias been brought to the jury's attention, the argument runs, the credibility of the police testimony identifying the defendant as one of the assailants might have been seriously weakened.

As for the defendant's claim that Parkman's interview provided additional exculpatory evidence known to the police (making her release inexcusable), the defendant refers only to Parkman's statement that the shooter was wearing a grayish looking cap, while Officers Cox and Jones saw the assailant bareheaded. Given Parkman's statements that the person she saw on television — the defendant — was the same size, the same build, and wearing the same clothes as one of the assailants, the argument that exculpatory evidence is to be found in the fact that (i) Parkman saw the shooter with a hat when firing the AK-47 and (ii) the police, a short while later, saw the defendant without a hat as he fled the scene upon the arrival of the police, is "tenuous at best, and without any supporting evidence, approaches impermissible speculation at worst." *Commonwealth* v. *Woods*, 414 Mass. 343, 355 (1993).[9]

The linchpin in the defendant's argument — that the police, when they released Parkman, had knowledge of the ex-

---

[9]A discarded hat was not found at the scene of the shooting.

culpatory content of Parkman's showup statement *and* of her interview with the police — fails because (i) Parkman's police interview does *not* contain any material exculpatory evidence, and (ii) Parkman's alleged showup statement is inconsistent with her recorded statements to the police in her interview identifying the defendant as one of the assailants. Thus Parkman's showup statement, when considered in the context of her recorded police interview, lacks any reasonable guarantee of the trustworthiness or reliability of the defendant's account of the alleged showup statement; it was no more than "remote and inconsequential." *Commonwealth* v. *Sendele*, 18 Mass. App. Ct. 755, 761 (1984). The judge was within his discretion in excluding the proffered statements of Parkman. *Commonwealth* v. *LaVelle*, 414 Mass. 146, 153-154 (1993) ("Determining whether the evidence demonstrates bias . . . falls within the discretion of the trial judge").

The defendant also argues that the exclusion of the proffered statements violated his right to present evidence of police bias under the Federal and Massachusetts Constitutions; that right, however, is limited to presenting evidence "through any competent means." *Commonwealth* v. *Grenier*, 415 Mass. 680, 686 (1993). For the reasons described in the text, the defendant was not foreclosed from exercising his right by "competent means."[10],[11]

---

[10]Alternatively, the defendant sought to introduce evidence of the outstanding default warrant that required Parkman's arrest. The argument is that the failure of the police to follow "police practice" in this instance — Parkman was released, not arrested, following her interview — is evidence of police bias and falls within such cases as *Commonwealth* v. *Flanagan*, 20 Mass. App. Ct. 472 (1985) (failure of police to ask certain witnesses to view a lineup admissible to show that the reason for the omission was police bias). If there was error, it was harmless. As noted in the text, the police interview of Parkman did not disclose any material exculpatory evidence. Assuming that her arrest would have been followed by her trial, conviction, incarceration, and availability for the trial, her testimony would have supported the Commonwealth's case, and the police, when they released Parkman, had no reason to believe otherwise. Thus evidence of the outstanding warrant, like evidence of her release, is insufficient to support an inference of bias against the defendant. See *id.* at 477.

[11]We note that the defendant explored the issue of police procedures at the trial, and the judge instructed the jury that they could consider evi-

2. *Cross-examination of defendant's expert witness.* The defendant argues that during the cross-examination of the defendant's forensic expert, the prosecutor made repeated assertions that the testing advocated by the expert had been abandoned by the Federal Bureau of Investigation as unreliable. The defendant moved to strike the questions and brought to the judge's attention that the prosecutor had offered no evidentiary basis for the challenged questions. The motion was denied; there was no error. The defendant's expert had acquiesced in the prosecutor's insinuation: "[I]f you're telling me they changed their policy, then it may well be." See *Commonwealth v. Delrio*, 22 Mass. App. Ct. 712, 721 (1986).

3. *Jury instructions on joint venture.* The defendant argues that the evidence did not support the instruction on joint venture. At trial, he specifically argued that there was no evidence of a shared mental state.

There was sufficient evidence to instruct the jury on joint venture. Kenneth Pounds saw two men standing together across the street from the Pounds' home on Fuller Street. Upon seeing Pounds, one of the men yelled, "Let's get him," firing a burst of shells as Pounds ran toward his house. After the shooting, Officers Cox and Jones first saw two men leaning against a car on Fuller Street, fumbling with something. Officers Cox and Jones positively identified the defendant as the person with a rifle in his hand fleeing from the vicinity of the crime, with a companion, immediately upon sight of the police. The defendant and his companion, in full flight from the scene of the shooting, exhibited a consciousness of guilt. See *Commonwealth v. Toney*, 385 Mass. 575, 583 (1982); *Commonwealth v. Anderson*, 396 Mass. 306, 312 (1985). There was sufficient evidence for the jury to infer that the defendant or his companion was the shooter, and that the defendant and his companion shared the same criminal intent. Compare *Commonwealth v. Giang*, 402 Mass. 604,

---

dence of the failure of the police to follow their usual procedure in deciding whether the Commonwealth had carried its burden of proof.

609-610 (1988).. There was no error. See *Commonwealth* v. *Clarke*, 418 Mass. 207, 214 (1994).

*Judgments affirmed.*