**UNITED STATES of America**

v.

**Ronald A.X. STOKES.**

**Cr. No. 95–10379–EFH.**

United States District Court,
D. Massachusetts.

Nov. 18, 1996.

James S. Dilday, Grayer, Brown & Dilday, Boston, MA, William A. Brown, Boston, MA, for Ronald A.X. Stokes.

Ralph F. Boyd, Jr., Office of the United States Attorney, Boston, MA, for U.S.

### MEMORANDUM AND ORDER

HARRINGTON, District Judge.

This matter is before the Court on a motion to dismiss filed by the defendant. The defendant was charged on December 5, 1995, with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). In the motion the defendant claims that (1) the statute of limitations bars this prosecution; (2) the defendant's Fifth Amendment right to due process was violated by prejudicial pre-indictment delay; (3) the defendant's Sixth Amendment right to a speedy trial was violated by prejudicial pre-indictment delay; and (4) under Rule 48 of the Federal Rules of Criminal Procedure the charge against the defendant should be dismissed for unnecessary delay in initiating the prosecution.

## I. STATEMENT OF THE CASE

### A. The Underlying Facts

The facts in this case can be gleaned by a review of the underlying state prosecution of the Defendant Ronald A.X. Stokes. The facts which the Court will discuss are taken

from the findings of fact made by the Massachusetts Appeals Court. These findings of fact can be found in *Commonwealth v. Stokes*, 38 Mass.App.Ct. 752, 752–757, 653 N.E.2d 180 (1995).

From the Commonwealth's evidence, the jury could have found the following facts. Shortly after 4:00 A.M. on December 6, 1990, Kenneth Pounds left his house at 323 Fuller Street in the Dorchester section of Boston to drive to work at the Polaroid Corporation in Norwood. As he walked toward his driveway, he saw two men standing on the opposite side of the road, about two houses down the street. Pounds, uncertain and suspicious, turned and started back to his house. At that moment, he heard one of the men say, "Let's get him." Pounds picked up his pace, called to his wife to open the door, and ran into his house just as the shooting started. Pounds was wounded in his right arm, as was his wife Bettie. Once the front door was secured, Bettie called the police.

The Boston police officer who responded to the call found one Kenneth Wiggins dead in his automobile on Fuller Street from a gunshot wound to his back. Wiggins' companion, Sherry Parkman was not injured.

Officer Cox and his partner, Officer Jones, responded to the scene and gave chase to two men running down a nearby alleyway. Both officers identified defendant to be the man carrying the rifle during their pursuit. They were unable to catch defendant at that time. As Officer Jones returned to his cruiser he saw in a nearby dumptruck the same rifle he had seen in defendant's hands. Defendant was arrested a short time later by Officer Painten at a fire station near Fuller Street.

The slug found in Wiggins' body, the slugs found inside the home of the Pounds, and an empty shell casing found outside the Pounds' house all were fired from the rifle, an AK–47 rifle, which Officer Jones had found.

### B. *The Procedural History*

The Defendant Ronald A.X. Stokes was arrested on December 6, 1990, on charges stemming from the shooting which had occurred on Fuller Street in the Dorchester section of the City of Boston. The defendant was indicted by a Suffolk Superior Court Grand Jury on December 27, 1990. He was charged with: (a) first degree murder (murder of Kenneth Wiggins), in violation of Mass.Gen.L. ch. 265, § 1 (1990 ed.), which carries a maximum sentence of life imprisonment without the possibility of parole; (b) assault and battery with a dangerous weapon (shooting of Kenneth Pounds), in violation of Mass.Gen.L. ch. 265, § 15A (1990 ed.), which carries a maximum sentence of ten years in the state prison; (c) assault and battery with a dangerous weapon (shooting of Betty Pounds), in violation of Mass.Gen.L. ch. 265, § 15A (1990 ed.); and (d) unlawfully carrying a firearm, in violation of Mass.Gen.L. ch. 269, § 10(a) (1990 ed.), which carries a maximum sentence of five years in state prison. The case went to trial in Suffolk Superior Court in August of 1992.

On August 11, 1992, the defendant was convicted by a Suffolk Superior Court jury of (a) assault and battery with a dangerous weapon (shooting of Kenneth Pounds); (b) assault and battery with a dangerous weapon (shooting of Betty Pounds); and (c) unlawfully carrying a firearm. The defendant was found not guilty on the count of first degree murder charging him with the shooting death of Kenneth Wiggins.

The defendant was sentenced to a term of (a) nine and one-half years to ten years on the charge of assault and battery with a dangerous weapon; (b) nine and one-half years to ten years on the charge of assault and battery with a dangerous weapon; and (c) four and one half years to five years on the charge of unlawfully carrying a firearm, to be served consecutively.[1]

The defendant appealed all three counts of conviction. The Massachusetts Appeals Court affirmed the defendant's convictions in a decision dated July 19, 1995. *Commonwealth v. Stokes*, 38 Mass.App.Ct. 752, 653 N.E.2d 180 (1995), and the Supreme Judicial Court denied further appellate review, *see Commonwealth v. Stokes*, 421 Mass. 1103, 655 N.E.2d 1277 (1995).

---

1. The defendant's anticipated release date is February 20, 2006.

By means of a Special Agent from the Bureau of Alcohol, Tobacco and Firearms, the United States of America first learned about the facts underlying the instant indictment in or about March, 1993. A letter from ATF Special Agent Henry Moniz, Sr., recommending federal prosecution and an accompanying file was forwarded to the United States Attorney's Office on or about June 9, 1993.

The United States Attorney's Office did not act on the information that was forwarded to them by the ATF until December 1, 1995. On this date the Assistant United States Attorney assigned the case requested an authorized waiver of the Petite policy from the Department of Justice in Washington, DC. On December 4, 1995, the United States Attorney's Office received an authorized waiver of the Petite policy. The case was then presented to the federal grand jury sitting in Boston on December 5, 1995, which returned the instant indictment on that date charging the defendant with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). On December 18, 1995, the defendant appeared for his initial appearance and the government did not move for detention. The defendant was arraigned on the charge on January 12, 1996.

## II. *ANALYSIS*

### A. *Statute of Limitations*

■ The defendant argues that the statute of limitations began to run on December 6, 1990, at 4:09 A.M. and expired on December 5, 1995, at 4:09 A.M. The statute of limitations applicable here is 18 U.S.C. § 3282—"Offenses Not Capital." This section states:

> Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.

The general rule of construction is that "a statute of limitations begins to run on the day following the day on which the event giving rise to the cause of action occurred."

*United States v. Guerro,* 694 F.2d 898, 901 (2d Cir.1982), *cert. denied,* 459 U.S. 1222, 103 S.Ct. 1230, 75 L.Ed.2d 463 (1983) (citing *Burnet v. Willingham Loan & Trust Co.,* 282 U.S. 437, 439, 51 S.Ct. 185, 185, 75 L.Ed. 448 (1931)). Under these facts, the statute of limitations began to run on December 7, 1990. The instant indictment was returned on December 5, 1995, which is within the five year statute of limitations.

### B. *Pre-Indictment Delay*

Having determined that the United States Attorney's Office commenced its prosecution within the statute of limitations, I now consider whether the lengthy pre-indictment delay violated defendant's due process rights.

■ Since the statute of limitations is " 'the primary guarantee against bringing overly stale criminal charges,' " *United States v. Marler,* 756 F.2d 206, 213 (1st Cir.1985) (quoting *United States v. Marion,* 404 U.S. 307, 322, 92 S.Ct. 455, 464, 30 L.Ed.2d 468 (1971)), "the Supreme Court has held that 'the Due Process Clause has a limited role to play in protecting against oppressive delay.' " *Ibid.* (quoting *United States v. Lovasco,* 431 U.S. 783, 789, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977)). "To prevail on a due process challenge, a defendant bears the heavy burden of showing that the delay in indictment caused him actual prejudice and that the delay was 'undertaken by the Government solely to gain tactical advantage over the accused.' " *Ibid.* (quoting *United States v. Marion,* 404 U.S. at 324, 92 S.Ct. at 465).

Defendant asserts that the government's delay in indicting him actually prejudiced him in conducting his defense because he cannot call three witnesses to testify on his own behalf. He alleges that since the date of the crime two witnesses who could have testified and exonerated him have died. He claims that he has been unable, as well, to locate a crucial third witness.

In the defendant's motion to dismiss only one of these three allegedly necessary witnesses is named. The named witness, Sean Michael Price, however, died two months before defendant's state murder trial even commenced. The death of this witness occurred approximately one year before the United

States Attorney's Office had knowledge of the facts underlying the present charge. Defendant does not even identify who his other dead witness is. Neither does Stokes proffer any explanation as to why their testimony would be necessary nor how the testimony would have exonerated him.

Defendant also neglects to identify in his motion the crucial witness whom he is unable to locate. At oral argument she was identified as an individual named Sherry Parkman who was the passenger in the motor vehicle in which Kenneth Wiggins was shot dead. Ms. Parkman never testified at the defendant's state court trial because neither the Commonwealth nor the defendant could locate her at that time. At the state court trial defendant alleged that Ms. Parkman had made statements which would exculpate him. Boston Police Department investigators who interviewed Ms. Parkman at the crime scene insist that she made no exculpatory statements.

 "A defendant 'has a heavy burden to prove that a pre-indictment delay caused actual prejudice: the proof must be definite and not speculative;' 'bare allegations' will not suffice." *Acha v. United States*, 910 F.2d 28, 32 (1st Cir.1990) (quoting *United States v. Valentine*, 783 F.2d 1413, 1416–17 (9th Cir. 1986)). Here, defendant offers no explanation as to how the two deceased witnesses would have exonerated him. Nor can defendant explain how the unavailability of the witness Parkman actually prejudiced his defense. The defendant has utterly failed to make out a claim of actual prejudice. Speculation, conjecture and bare allegations do not suffice in meeting the defendant's "heavy" burden.

 Defendant has also failed to offer any evidence that the delay was undertaken solely to gain tactical advantage over the accused. He contends that the United States had knowledge of the underlying facts as early as March of 1993. Mere knowledge, however, does not support a claim of inten-

tional delay for tactical advantage. "In the absence of evidence from which to infer a bad motive, we are left with the government's explanation, such as it is." *United States v. Marler*, 756 F.2d at 215 n. 6. The government states its reasons for the delay as twofold: (1) because the defendant was incarcerated in the state system the government prioritized its prosecutions and, thus, prosecuted those cases where the offender would not be in custody but for federal prosecution; and (2) the United States chose to wait until the defendant's state court convictions and sentence were finalized before making a final prosecution decision.[2]

Although the Court rules that there is no due process violation because of pre-indictment delay, I find the government's explanation for the delay to be extremely weak and bordering on being disingenuous.

The United States has stated that the reason for the federal prosecution of Defendant Stokes was that his state court prosecution failed to adequately vindicate the substantial federal interest in protecting the public from a violent recidivist.[3] The defendant, if convicted on the federal charge, will receive a substantially greater sentence than the one imposed in state court.[4] Yet, this concern became ripe on August 11, 1992, the date on which the defendant was acquitted of murder and the Commonwealth lost the authority to sentence the defendant to life imprisonment. The suggestion that the pre-indictment delay was caused by a deference to state court appellate proceedings is a red herring. If the concern of the United States was the relatively short sentence which was imposed, the appellate proceedings in state court would have absolutely no bearing thereon. For even if the Commonwealth had been successful in affirming the conviction on appeal, as it was, the state sentence could not be lengthened. If the state appellate proceedings were to have continued until 1996, does that mean the defendant would never have been indicted federally? I think not.

**2.** See the government's response to question 21 of the Court's discovery order.

**3.** See the government's response to question 19 of the Court's discovery order.

**4.** See the government's response to question 14 of the Court's discovery order.

Secondly, the United States suggests that the pre-indictment delay was caused by the government's prioritizing its prosecutions to address non-custodial cases first. Under the separation of powers doctrine, the Judicial Branch has very little leeway to question the motives of the Executive Branch. In fact, " 'in the absence of clear evidence to the contrary, courts presume that they (the members of the Executive Branch) have properly discharged their official duties.' " *United States v. Armstrong,* — U.S. —, —, 116 S.Ct. 1480, 1486, 134 L.Ed.2d 687 (1996) (quoting *United States v. Chemical Foundation, Inc.,* 272 U.S. 1, 14–15, 47 S.Ct. 1, 6, 71 L.Ed. 131 (1926)). This being fundamental constitutional doctrine, this Court would be remiss in not at least criticizing this exercise of executive power. By delaying the indictment of the defendant until almost the very last day and not moving to have him detained on the federal charge, the United States has, in effect, added a number of years to his sentence. Assuming that there were a reasonably timely response to the letter recommending federal prosecution forwarded by the ATF in March of 1993, defendant would have had an opportunity to run his state and federal sentence concurrently for several years. Though the United States Attorney's Office has received no "tactical" advantage from its delay, defendant has been prejudiced. However, under current law applicable to pre-indictment delay, the Court can only frown upon such tactics which resulted in such substantial delay.

## C. *Sixth Amendment*

Defendant contends that the extended pre-indictment delay violated his right to a speedy trial under the Sixth Amendment of the United States Constitution. It is clear, however, that " 'no Sixth Amendment right to speedy trial arises prior to the filing of a criminal charge.' " *United States v. McCoy,* 977 F.2d 706, 712 (1st Cir. 1992) (quoting *United States v. MacDonald,* 456 U.S. 1, 7, 102 S.Ct. 1497, 1501, 71 L.Ed.2d 696 (1982)). Defendant makes no complaint of any undue delay concerning the time since his federal indictment. Rather his complaints are focused on the time frame from his state arrest to his federal indict-

ment. "An arrest or indictment by one sovereign would not cause the speedy trial guarantees to become engaged as to possible subsequent indictments by another sovereign." *United States v. MacDonald,* 456 U.S. at 10 n. 11, 102 S.Ct. at 1503 n. 11. Therefore, the Sixth Amendment does not provide a ground for relief in this case.

## D. *Rule 48 Dismissal*

Defendant states that the Court should exercise its power under Rule 48 and dismiss the charge pending against him for unnecessary delay in the prosecution. Rule 48(b) of the Federal Rules of Criminal Procedure provides:

> If there is unnecessary delay in presenting the charge to a grand jury or in filing an information against a defendant who has been held to answer to the district court, or if there is unnecessary delay in bringing a defendant to trial, the court may dismiss the indictment, information or complaint.

"Rule 48(b) is limited in application to post-arrest delay." *United States v. McCoy,* 977 F.2d at 712 n. 6 (citing *United States v. Marion,* 404 U.S. at 319, 92 S.Ct. at 463). Rule 48(b) is not applicable to any delay prior to his arrest or indictment on the federal charge.

## III. *CONSTITUTIONAL CONSIDERATIONS*

The Defendant Stokes is charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). As a result of his prior criminal history he qualifies for an enhanced penalty pursuant to 18 U.S.C. § 924(d). The relevant conduct in this case was the murder of Kenneth Wiggins. Under United States Sentencing Guidelines [U.S.S.G.] § 2K2.1(1) the Court is required to calculate defendant's base offense level as if he had been convicted of this murder and, thus, in the circumstances of this case, the sentence to be imposed is life imprisonment without the possibility of parole for the firearms offense.

Defendant, after trial in state court, was found not guilty of the murder of Kenneth Wiggins, but guilty of unlawfully carrying a

firearm. Upon being presented with the evidence and applying the standard of guilt beyond a reasonable doubt, a jury of his peers acquitted him of the murder charge. Upon defendant's acquittal the Commonwealth of Massachusetts absolutely lost the authority to incarcerate him' for life. At disposition in this case, however, the United States Attorney will ask me, in effect, to find defendant guilty of murder by a preponderance of the evidence standard and to incarcerate him for life.[5]

This case raises vexing issues of due process, double jeopardy and selective prosecution which I shall address.

### A. *Due Process*

Congress has not federalized the state crime of murder, and so has not authorized a successive federal prosecution on the murder charge under the doctrine of dual sovereignty. *United States v. Lombard,* 72 F.3d 170, 179 n. 11 (1st Cir.1995).[6] Thus, a due process question is raised as to whether the Federal Sentencing Guidelines effectively punish the defendant for conduct for which there exists no statutory authorization for the government even to prosecute. *Ibid.*

The Supreme Court decisions have indicated that the Guidelines are not entirely free from constitutional constraints. *Id.* at 176. "On the contrary, the Court has cautioned against permitting a sentence enhancement to be the 'tail which wags the dog of the substantive offense.'" *Ibid.* (quoting *McMillan v. Pennsylvania,* 477 U.S. 79, 88, 106 S.Ct. 2411, 2417, 91 L.Ed.2d 67 (1986)). The Supreme Court in *McMillan* sanctioned the practice of considering uncharged conduct in order to increase the sentence a defendant would receive. The Court was mindful, however, to recognize a due process restriction on this practice. The Court refused to sanction a situation where the factoring in of uncharged conduct to the sentence resulted in a sentence in excess of the maximum

penalty for the charged conduct. *McMillan v. Pennsylvania,* 477 U.S. at 87–88, 106 S.Ct. at 2416–17. The life sentence that defendant would receive here would be punishment for the murder and not for the firearms offense charged.

The procedural protections that are provided to criminal defendants by the United States Constitution are sacrosanct. Among these is the requirement that there be proof beyond a reasonable doubt in order to convict one of a crime. *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970). To nullify the state court acquittal and to find defendant guilty of murder by a mere preponderance of the evidence is a practice which raises a grave constitutional question. For the Federal Sentencing Guidelines to call for a sentence of life imprisonment without the possibility of parole for a murder over which the federal court has no jurisdiction and where there has been a state court acquittal would give any sentencing judge deep concern.

The *Lombard* Court recognized there was a grave constitutional issue presented in that case, but did not address it because the sentencing judge had not considered a downward departure under U.S.S.G. § 5K2.0. *United States v. Lombard,* 72 F.3d at 183. In order to reach a downward departure, however, this Court would first have to find that the murder had been committed by defendant by a preponderance of the evidence and then to enhance the sentence to life imprisonment without the possibility of parole.

Moreover, any downward departure, under this procedure, would be discretionary. Yet, the Federal Sentencing Guidelines were created to enhance uniformity in sentencing and to safeguard defendants from arbitrary sentencing procedures. *United States v. LaGuardia,* 902 F.2d 1010, 1014 (1st Cir.1990). "The strong hope is that rather than offend due process, the guidelines—properly admin-

---

5. See the government's response to question 26 of the Court's discovery order.

6. In 1992, Henry Lombard, Jr., and Hubert Hartley were tried in Maine Superior Court on charges of murdering two men on Thanksgiving day in 1990. They were tried separately and both acquitted. The facts, as outlined in the case, are silent as to whether any state firearms charges were filed in state court. One year later, both men were indicted on federal firearms charges arising out of the murders.

istered—will greatly advance the fairness in criminal sentencing." *United States v. Seluk*, 873 F.2d 15, 17 (1st Cir.1989). How can an ostensible "uniform" sentencing system which leaves it to the discretion of a district judge to decide whether defendant's sentence is to be a term of fifteen years or a term of life without parole be anything but arbitrary. The exercise of judicial discretion within such expansive boundaries flies in the face of the very rationale for the Guidelines.

The *Lombard* Court stated that its facts and procedural history made it an unusual case, perhaps a singular one. *United States v. Lombard*, 72 F.3d at 187. In an age of prosecutorial restraint that may have been the case. The indictment in the instant case was returned ten days prior to the issuance of the First Circuit's decision in *Lombard*. It would appear that at the present time whenever a defendant is acquitted of a murder involving the use of a firearm he is susceptible to being a target of a successive federal prosecution. Clearly, a reliance on a discretionary downward departure procedure dodges the truly vexing constitutional issue of due process presented in this case.

## B. *Double Jeopardy*

Defendant was convicted in state court of carrying a firearm in violation of Mass.Gen.L. ch. 269, § 10(a) (1990 ed.), and sentenced thereon. The elements of that offense are: (1) that the defendant possessed a rifle; (2) that what the defendant possessed met the legal definition of a "rifle"; and (3) that the defendant knew he had a rifle. Defendant is charged in federal court with being a felon in possession of a firearm in violation of Title 18 U.S.C. § 922(g)(1). The elements of this offense are: (1) the accused is a convicted felon; (2) who knowingly possessed a firearm; and (3) which was connected with interstate commerce. The state conviction and the federal charge do not result in multiple punishment because the crimes require proof of different essential elements. *See Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932). This being true, however, the grave disparity between a four and one-half year term in state prison and life imprisonment without the possibility of parole in federal prison for the same offense is in the *nature* of double jeopardy.

The Fifth Amendment of the United States Constitution provides: "No person ... shall ... be subject for the same offense to be twice put in jeopardy of life or limb. . . ." This fundamental right protects us against being punished twice for the same offense. The dual sovereignty doctrine, however, limits the general principle against double jeopardy so that successive prosecutions based on the same conduct are permissible if brought by separate sovereigns. *See Heath v. Alabama*, 474 U.S. 82, 88, 106 S.Ct. 433, 437, 88 L.Ed.2d 387 (1985). This exception to the rule derives from the tenet that when "a defendant in a single act violates the 'peace and dignity' of two sovereigns by breaking the laws of each, he has committed two distinct 'offences' " and as a result can be prosecuted by each sovereign. *United States v. Guzman*, 85 F.3d 823, 826 (1st Cir.), cert. denied —— U.S. ——, 117 S.Ct. 537, 136 L.Ed.2d 422 (1996) (citing *Heath v. Alabama*, 474 U.S. at 88, 106 S.Ct. at 437).

There is one exception, however, to the exercise of the dual sovereignty doctrine. When a second sovereign brings a prosecution under the guise of a separate sovereign but, in truth, it is a second prosecution by the first sovereign, double jeopardy will attach. *See Bartkus v. Illinois*, 359 U.S. 121, 123, 79 S.Ct. 676, 678, 3 L.Ed.2d 684 (1959). The *Bartkus* exception is narrow. "It is limited to situations in which one sovereign so thoroughly dominates or manipulates the prosecutorial machinery of another that the latter retains little or no volition in its own proceedings." *United States v. Guzman*, 85 F.3d at 827.

It is apparent from a review of the record in this case that the defendant has failed to raise any question that the successive federal prosecution was manipulated and controlled by the state. The defendant must produce some evidence showing that one sovereign is the pawn of the other. When a defendant can make such a showing—that the ostensibly independent prosecution is a sham—it is then incumbent on the sovereign

involved in the successive prosecution to prove that it is not a tool of the other. *Ibid.* Since the defendant has produced no such evidence, the *Bartkus* exception is not applicable to the case before the Court.

The federal prosecution of this case is protected by the dual sovereignty doctrine and there is no conventional legal analysis which can pierce its veil. Yet the dual sovereignty doctrine cannot continue to be used as a cloak to circumvent the spirit of the principle of double jeopardy when such a shockingly disparate sentence can result, as is the case here.

The principle behind the dual sovereignty doctrine has been with us since the inception of this nation. The concepts of federalism and states' rights have provided the firm bedrock on which the dual sovereignty doctrine stands. The federal courts have always been mindful, however, of the unfairness associated with successive prosecutions based on the same conduct. *Rinaldi v. United States,* 434 U.S. 22, 27, 98 S.Ct. 81, 84, 54 L.Ed.2d 207 (1977). *See also United States v. Lanza,* 260 U.S. 377, 383, 43 S.Ct. 141, 143, 67 L.Ed. 314 (1922) (Chief Justice Taft, quoting from *Fox v. Ohio,* 5 How. 410, 435, 12 L.Ed. 213 (1847), noted: It is almost certain that in the benignant spirit in which the institutions both of the state and federal systems are administered, an offender who should have suffered the penalties denounced by the one would not be subjected a second time to punishment by the other for acts essentially the same, unless indeed this might occur in instances of peculiar enormity, or where the public safety demanded extraordinary rigor). Under the separation of powers the Executive Branch is granted the power of prosecutorial discretion. The Petite policy, which was given its name in 1960, is the long-standing executive policy formulated by the United States Department of Justice in response to the Supreme Court's concern with successive prosecutions. Although not constitutionally mandated, the executive policy serves to protect that interest which, but for the "dual sovereignty"

principle inherent in our federal system, would be embraced by the Double Jeopardy Clause. *Rinaldi v. United States,* 434 U.S. at 29, 98 S.Ct. at 85.

"The Petite policy is an internal Justice Department policy forbidding federal prosecution of a person for alleged criminality which was 'an ingredient of a previous state prosecution against that person'; exceptions are made only if the prosecution will serve 'compelling interests of federal law enforcement.'" *United States v. Gary,* 74 F.3d 304, 313 (1st Cir.), *cert. denied,* — U.S. —, 116 S.Ct. 2567, 135 L.Ed.2d 1084 (1996) (quoting *Thompson v. United States,* 444 U.S. 248, 100 S.Ct. 512, 62 L.Ed.2d 457 (1980)). The Petite policy does not confer any substantive right on criminal defendants. *Ibid.* However, I discuss it in the context of the concern over successive prosecutions which led to the formulation of the Petite policy.

In my experience in the Department of Justice [7] with respect to the implementation of the Petite policy, it was the practice that there would be a dual prosecution *only* if the state prosecution had ended in an acquittal and then only if that acquittal was the result of unjust or discriminatory action on the part of the state. An example as to the Petite policy being waived was the federal prosecution of local law enforcement officials in Mississippi who had been acquitted in state court for the murders of the three civil rights workers in Philadelphia, Mississippi in 1964. After such an acquittal the officials were subsequently successfully prosecuted in federal court for violation of the victims' federal civil rights. The Justice Department justified its successive prosecution on the ground that the jury acquittal was the product of racial prejudice.

The United States Constitution entrusted law enforcement to the states under the Tenth Amendment. As the nation expanded the states were incapable of effectively enforcing laws relating to crimes occurring between states. The federal Congress began to federalize law enforcement to address the

---

**7.** Trial Attorney, Criminal Division, U.S. Department of Justice, 1961–1965; Assistant United States Attorney, 1965–1969; Attorney in Charge, U.S. Department of Justice's Organized Crime Strike Force, 1970–1973; United States Attorney, 1977–1981.

growing problem of interstate criminal activity. This process created a duality of criminal jurisdiction between state and federal courts for essentially the same criminal conduct. The federalization of law enforcement has the effect of entrusting broad prosecutorial authority to federal law enforcement officials. This authority was always tempered by the Petite policy and by focusing limited federal resources to the investigation in critical federal areas, such as organized crime, economic crime, narcotics and civil rights enforcement. *See* Ashdown, Gerald G., *Federalism, Federalization, and the Politics of Crime*, 98 W.Va.L.Rev. 789.

The powers of federal prosecutors as members of the Executive Branch have grown enormously in the last twenty-five years. Under a broad interpretation of the Commerce Clause, Congress has continued to increase the federal jurisdiction of law enforcement into areas well beyond organized crime, economic crime, narcotics and civil rights. Congress has also superimposed a uniform sentencing system. Because of what Congress perceived as "unjustifiably wide" disparities and "shameful" consequences which had occurred under the indeterminate sentencing system, the Congress enacted the Federal Sentencing Guidelines which are in effect a determinate sentencing system. *See* S.Rep. No. 225, 98th Cong., 2d Sess. 38, 65, reprinted in 1984 U.S.Code Cong. & Admin.News 3182, 3221, 3248. These Sentencing Guidelines curtail the sentencing judge's discretion. *United States v. Seluk*, 873 F.2d at 17. The loss of discretion by the Judicial Branch is not my concern. My concern lies in the fact that this discretion has been transferred to the Executive Branch, one of the parties to the action and not an impartial arbiter. The power to prosecute is now in effect the power to sentence as well.

The reason that the United States Attorney's Office indicted the defendant is that it is seeking to impose the sentence of life imprisonment without the possibility of parole. This is the sentence called for by the Sentencing Guidelines. It is as apparent that under the prior indeterminate sentencing system the United States Attorney would never have indicted this defendant. The 23-1/2 year sentence imposed by the state court would have been sufficient to both the federal prosecutor and federal judge alike because the sentence of life without the possibility of parole would never have been a practicable option and in the instant case the defendant was *convicted* of the firearms possession charge in state court and there is *no* indication that the verdict on the murder charge was the product of racial prejudice or of a corrupt judicial system. It is with the newly bestowed powers of the Federal Sentencing Guidelines that once acceptable state sentences now become manifestly unjust in the eyes of the prosecutor.

### C. *Selective Prosecution*

The United States Attorney states that the reason it selected defendant for federal prosecution is because the sentence he received in state court failed to adequately protect the public from a violent recidivist. This Court ordered the United States Attorney's Office to answer a question addressing how often it selected a defendant for successive prosecution after a state court conviction for the crime sought to be prosecuted in federal court. It refused to answer.[8] The defendant failed to raise, nor is there any reason to believe, that there is a selective prosecution issue lurking here. Selective prosecution would occur only if defendant had been singled out for an invidious reason. *United States v. Saade*, 652 F.2d 1126, 1135 (1st Cir.1981). This prosecution was not commenced for an invidious reason. This Court, however, is concerned about the selection of a defendant for federal prosecution after a state court jury acquittal, and on a charge for which he was *convicted* in state court. The federal courts should not be used by the United States Attorney's Office as an "appellate court" in which to correct jury verdicts and enhance state court sentences.

### D. *Ruling*

██ This case presents the following factors which give rise to constitutional implications:

---

8. See the government's response to question 18 of the Court's discovery order.

1. A substantial delay between the date of the offense, December 6, 1990, and the date of the return of the federal indictment, December 5, 1995.

2. In fact, a successive prosecution for the offense of possession of a firearm for which the defendant has already been convicted and sentenced to a term of four and one-half to five years imprisonment, and for the same offense he now faces the disparate sentence of life imprisonment without the possibility of parole.

3. In effect, a successive prosecution for the offense of murder for which the defendant has already been acquitted by a jury, but is now to be tried for that same offense under the less rigorous standard of proof of "by a preponderance of the evidence."

4. A form of actual "selective" prosecution, in that the prosecutorial decision is the product of unfettered discretion guided by no standard other than the prosecutor's disagreement with the state jury's verdict of acquittal on the murder charge, although there is no indication that such verdict of acquittal was the product of racial prejudice or of a corrupt judicial system. The government refuses to advise the Court as to how many defendants fall within the category of individuals who suffered successive prosecution for an offense for which they had previously been convicted in state court. It is this Court's judgment that such defendants would be very *rare*—only those very, very few who have been acquitted by a jury of murder.

Although no one factor, by itself, may offend constitutional canons, the effect of all of the factors in the aggregate, in my judgment, violates the Due Process Clause of the Fifth Amendment of the United States Constitution. *United States v. Lombard,* 72 F.3d at 177. The Due Process Clause has not been reduced to any formula for "[d]ue process centrally concerns the fundamental fairness of governmental activity." *Quill Corporation v. North Dakota,* 504 U.S. 298, 311, 112 S.Ct. 1904, 1912, 119 L.Ed.2d 91 (1992). Fair play is the essence of due process and, thus, this prosecution must not be permitted to proceed, and I so rule. It is not fitting for the United States to be vindictive, as a spirit of vengeance is not in keeping with the precepts of balance and moderation which are the foundation of our legal tradition. Defendant's Motion to Dismiss the firearms possession charge, for which same offense he has already been convicted and sentenced in state court and for which offense the United States now seeks a term of imprisonment of life without parole, is allowed.

SO ORDERED.