# United States Court of Appeals
## For the First Circuit

No. 00-2397

UNITED STATES OF AMERICA,

Appellee,

v.

RONALD A. X. STOKES,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Torruella, Dyk,[*] and Howard,
Circuit Judges.

Judith H. Mizner, for appellant.
Cynthia A. Young, Assistant United States Attorney, with whom
Michael J. Sullivan, United States Attorney, was on brief, for
appellee.

November 5, 2004

---

[*]  Of the Federal Circuit, sitting by designation.

**TORRUELLA, Circuit Judge**.  A jury convicted defendant-appellant Ronald Stokes of being a felon in possession of a firearm.  See 18 U.S.C. § 922(g).  The district court sentenced him to 360 months imprisonment -- of which 283 months were to be served concurrently with a state sentence he had already begun serving -- and 60 months of supervised release.  Stokes argues three issues on appeal: (1) the district court erred by excluding proffered expert testimony regarding eyewitness identification; (2) the district court erred by imposing a sentence in excess of 25 years; and (3) pursuant to Blakely v. Washington, 124 S. Ct. 2531 (2004), his sentence violated the Sixth Amendment of the United States Constitution.

After careful review, we affirm the conviction and sentence.

## I.  Background

### A.  Facts

The factual foundation of this case has been thoroughly explained elsewhere.  See United States v. Stokes, 124 F.3d 39, 41-43 (1st Cir. 1997); United States v. Stokes, 947 F. Supp. 546, 548-50 (D. Mass. 1996); Commonwealth v. Stokes, 653 N.E.2d 180, 181-85 (Mass. App. Ct. 1995), rev. denied, 655 N.E.2d 1277 (Mass. 1995).  The facts, as they pertain to this appeal, are briefly described below.

In the early morning of December 6, 1990, an altercation occurred at 7 Don Street. The altercation began when José Candelaria a/k/a Miguelín, a resident of 318 Fuller Street, began smashing the windows of the cars in front of 7 Don Street. Candelaria also broke the front window of the 7 Don Street home. Candelaria ultimately pushed his way into the 7 Don Street house after Linda Stokes, one of the house's occupants, went to speak with Candelaria. According to Linda Stokes, Candelaria had a long gun. Eventually, Candelaria left 7 Don Street, firing several shots as he drove away. The Boston police arrived at 3:25 a.m. to investigate the disturbance. After the police left, Ronald Stokes, who also lived at 7 Don Street, arrived home and was informed of the altercation.

Around 4:00 a.m. an incident occurred on Fuller Street, the street where Candelaria lived. Kenneth Pounds, a Fuller Street resident, was leaving his house at 323 Fuller Street on his way to work. While walking to his car, Mr. Pounds noticed two men in front of a vacant house. Suspicious, Mr. Pounds turned to go back inside his home at which point he heard: "Let's get him." Before Pounds could close the door he heard gunshots. Both Pounds, and his wife Bettie, who had been standing in the doorway, were shot. Another individual, Kenneth Wiggins, was shot in the back and died in his automobile in Fuller Street.

At the time of this shooting, Boston Police Department Detective Michael Cox and Officer Craig Jones were traveling in the area of Fuller Street in an unmarked police car. Cox and Jones drove down Fuller Street, with their lights off, after being informed of the gunshots. They noticed two black men, one shorter than the other, leaning on a car near 310 Fuller Street. The two men looked as though they were fiddling with something. Upon seeing the cruiser, the two men ran. Officer Cox jumped out of the cruiser and broadcasted that he was in pursuit of a suspect with a gun.

The chase proceeded down an alleyway where the shorter man slipped on a patch of ice, fell to one knee, and dropped what Cox claimed was a firearm. The shorter man reached back to retrieve the item as Officer Cox, who was still in pursuit, came to within five to eight feet of the shorter man. At some point, Cox lost the shorter man in a dark alley. Cox did, however, hear a fence rattling.

Armed with a flashlight, Jones continued looking for the two men. Hearing a fence rattle, Jones shined his flashlight in the direction of 310 Fuller Street. Upon doing so, Jones saw the shorter man pulling his foot out of a fence. While pursuing the shorter man, Jones noticed an AK-47 five feet from the fence where the shorter man's foot had been stuck.

In the meantime, Cox met another police cruiser being driven by Officer Painten. Cox told Painten that the suspect was "a black male, short, bald-headed." A few minutes later, Painten saw and detained a man fitting that description. The man was sweating profusely. Cox and Jones drove to where the suspect was being detained. Cox and Jones confirmed that the detained individual was the shorter man who possessed a gun while trying to run away from them. The shorter man was identified as defendant-appellant Ronald Stokes. The slug found in Wiggins's body, the slugs found inside the Pounds's home, and an empty shell casing found outside the Pounds's home, were all fired from the AK-47 that Officer Jones had found five feet from where he had seen Stokes stuck in the fence.

## II.  Analysis

### A.  Excluding expert testimony

The central issue at trial was whether Ronald Stokes was the person who possessed the firearm. The bulk of the testimony on whether Stokes possessed the gun came from eyewitness identification by Officers Cox and Jones. To counter the testimony of Cox and Jones, Stokes indicated that Dr. Alexander Daniel Yarmey would testify as an expert regarding the validity of eyewitness testimony. On January 13, 1999, the district court instructed Stokes to file a memorandum of law explaining why Dr. Yarmey's testimony should be admitted. On February 25, 1999, four days

-5-

before trial and without having received Stokes's memorandum regarding expert testimony, the district court issued a memorandum excluding Dr. Yarmey's testimony.

The district court excluded the proposed expert testimony because, "[a]s a general proposition, the psychological factors that affect the reliability of eyewitness identification are a matter of common experience," and the admission of such testimony invades the province of the jury. Memorandum and Order Regarding Expert Eyewitness Identification Testimony 1 (Feb. 25, 1999). The district court recognized that such testimony is helpful in "special" circumstances, but failed to find that such circumstances existed in this case. Thus, the district court ruled that the testimony was inadmissable "both for its tendency to encroach on the jury's function and because of its lack of bearing on any material issue." Id. at 3.

The following day, Stokes filed a summary of Dr. Yarmey's testimony. The summary indicated that Dr. Yarmey would testify concerning "the scientific evidence regarding psychological factors which are involved in acquisition, retention and retrieval of information in situations similar to the circumstances in this case." The only other information the summary contained was that Dr. Yarmey sought to testify specifically regarding:

> [t]he effect of "weapon focus" with respect to an eyewitness's ability to perceive; [t]he effect of feeling afraid or upset at the time an eyewitness perceives a perpetrator; [t]he

-6-

distortions of time perception common to eyewitnesses; [t]he influence of expectations on the ability to identify a perpetrator; [t]he effect of suggestiveness post incident; [t]ransference of innocent encounters; [and] the relationship between an eyewitness's confidence and his/her identification and its accuracy.

Stokes did not request reconsideration of the district court's order excluding Dr. Yarmey's testimony.

"[W]e review a trial court's decision to admit or exclude expert testimony under an abuse of discretion standard." United States v. Díaz, 300 F.3d 66, 74 (1st Cir. 2002). Under this standard, we have given a district court's decision to admit or exclude evidence great deference. See United States v. Corey, 207 F.3d 84, 88 (1st Cir. 2000); United States v. Shay, 57 F.3d 126, 132 (1st Cir. 1995). For the reasons stated below, we believe that the district court did not abuse its discretion by excluding the testimony of Dr. Yarmey.

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony and "provides that a proposed expert witness must be sufficiently qualified to assist the trier of fact, and that his or her expert testimony must be relevant to the task at hand and rest on a reliable basis." Díaz, 300 F.3d at 73. The rule states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or

education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. By screening proffered expert testimony for both reliability and relevance, the district court performs an important gatekeeping role. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592-95 (1993). In this case, the district court exercised its gatekeeping role by excluding Dr. Yarmey's testimony.

Expert testimony "must be relevant not only in the sense that all evidence must be relevant . . . but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue." Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co., 161 F.3d 77, 81 (1st Cir. 1998) (citations omitted). Expert testimony on eyewitness identification presents an interesting question for admissibility purposes because eyewitness identification involves a "credibility determination within the ken of the ordinary judge and juror -- unlike, say, DNA identification." United States v. Brien, 59 F.3d 274, 276 (1st Cir. 1995). Fed. R. Evid. 702 permits expert testimony that "assist[s] the trier of fact," and it is possible that "an expert such as a psychologist familiar with identification problems could

give the jury background information about the mechanism of memory, types of errors, error rates, and other information not commonly possessed by the jury -- information that may even be at odds with what a judge or juror might expect." Id. at 276-77.

As we have previously stated, "[w]e are unwilling to adopt a blanket rule that qualified expert testimony on eyewitness identification must routinely be admitted or excluded." Id. at 277. Rather, we, and the district courts, should examine each case one by one, taking into account such concerns as "the reliability and helpfulness of the proposed expert testimony, the importance and the quality of the eyewitness evidence it addresses, and any threat of confusion, misleading of the jury, or unnecessary delay." Id.

When the district court ruled to exclude Dr. Yarmey's testimony, the record did not address the foundation for his testimony or how his testimony would aid a jury.[1] See, e.g., Brien, 59 F.3d at 277 (finding no abuse of discretion when defense failed to adequately respond to request for data or literature underlying an expert's testimony on eyewitness identification). Providing the district court with information underlying the expert's assumptions and conclusions allows the court to "gauge whether the testimony would be helpful to the jury

---

[1] The Defendant's Summary of Expert Testimony also did not contain this information.

or would confuse or mislead instead."  Id.  Without such guidance, the district court turned to the caselaw and concluded that expert testimony regarding eyewitness identification aids a jury where special circumstances exist, such as

> where an identification is made after a long delay or under conditions of extreme stress, see, e.g., United States v. Harris, 995 F.2d 532, 535 (4th Cir. 1993), or where a witness's faculties were impaired at the time of the identification, see, e.g., State v. Whaley, 406 S.E.2d 369, 372 (S.C. 1991), or where no independent evidence corroborates the defendant's guilt. . . .

Memorandum and Order Regarding Eyewitness Identification Testimony, at 2.

Without any information regarding the reliability and helpfulness of the proposed expert testimony and without any indication of the existence of a special circumstance, the district court could not conclude that the proposed expert testimony would "assist the trier of fact to understand the evidence."  Fed. R. Evid. 702.  Thus, the district court did not abuse its discretion when it excluded the expert's testimony.

## B.  Sentencing

Stokes was convicted of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g).  The penalty for violating § 922(g) is a fine, a term of imprisonment not to exceed ten years, or both.  18 U.S.C. § 924(a)(2).  Stokes, however, was sentenced to thirty years imprisonment pursuant to the

Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e). Stokes claims the district court committed plain error by concluding that the maximum penalty for violating the ACCA was life imprisonment because, he claims, the correct maximum penalty is supplied by 18 U.S.C. § 3559, which lists a Class C felony as having a maximum penalty of twenty-five years imprisonment. We disagree.

Before proceeding into the analysis, it is prudent to clarify Stokes's argument by analyzing the four statutory provisions involved. The first provision, 18 U.S.C. § 922(g), makes it unlawful for a felon to possess a firearm. The second provision, 18 U.S.C. § 924(a)(2), provides that a knowing violation of § 922(g) shall result in imprisonment for <u>not more than</u> ten years. The third provision, the ACCA, 18 U.S.C. § 924(e)(1), provides that a person convicted of violating § 922(g) who has three previous convictions referred to in the statute shall be sentenced to a term of imprisonment of <u>not less than</u> fifteen years. The ACCA does not supply a maximum term of imprisonment. The fourth provision, 18 U.S.C. § 3559(a)(3), classifies an offense as a Class C felony if the maximum term of imprisonment is "less than twenty-five years but ten or more years."

Stokes claims that since the ACCA is a sentencing enhancement statute, it does not create a new offense to be categorized under § 3559. Thus, applying § 922(g) -- the statute under which Stokes was convicted -- to § 3559, results in Stokes's

conviction being labeled a Class C felony, which has a maximum term of imprisonment of less than twenty-five years. Stokes therefore argues that the district court plainly erred in sentencing him to thirty years.

Stokes's argument fails for two reasons. First, this court has previously stated that the maximum penalty for those who fall within the ACCA is life imprisonment. See United States v. Weems, 322 F.3d 18, 26 (1st Cir. 2003) (stating that the maximum sentence under the ACCA is life imprisonment); see also Custis v. United States, 511 U.S. 485, 487 (1994) (stating that the ACCA "raises the penalty for possession of a firearm by a felon . . . to a mandatory minimum sentence of 15 years and a maximum of life in prison without parole"); United States v. Mack, 229 F.3d 226, 229 n.4 (3d Cir. 2000) (stating that the ACCA "specifies no maximum term of imprisonment [but] has been construed to authorize a life term"); United States v. Brame, 997 F.2d 1426, 1428 (11th Cir. 1993) (same); United States v. Guerrero, 5 F.3d 868, 874 n.12 (5th Cir. 1993) (same); United States v. Wolack, 923 F.2d 1193, 1199 (6th Cir. 1991) (same); United States v. Carey, 898 F.2d 642, 644 (8th Cir. 1990) (same); United States v. Blannon, 836 F.2d 843, 845 (4th Cir. 1988) (same). Stokes urges us to overturn this well-established precedent, but we decline to do so.

Second, Stokes's argument suffers from a misreading of § 3559(a). Section 3559(a) classifies "[a]n offense that is not

-12-

specifically classified by a letter grade in the section defining it."  18 U.S.C. § 3559(a).  The statute does not purport to limit the maximum term of imprisonment based upon how an offense is classified.  We therefore conclude that the district court did not plainly err in sentencing Stokes to thirty years imprisonment since such a sentence is between the statutory minimum of fifteen years and the maximum of life imprisonment.

## C.  **Blakely**

After sentencing and opening brief on appeal, Stokes filed a supplemental brief seeking additional review of his sentencing in light of the Supreme Court's recent decision in <u>Blakely</u>, 124 S. Ct. 2531 (2004).  Our precedent forecloses this issue.

In <u>Blakely</u>, the Supreme Court held that a state judge's sentence enhancement beyond the prescribed statutory maximum, based on the judge's own finding that the defendant acted with "deliberate cruelty," violated the defendant's Sixth Amendment right to a jury trial.  <u>Id.</u> at 2536-43.  This is because the facts supporting the sentence were neither admitted by the defendant nor found by a jury.  <u>Id.</u> at 2537.

Although <u>Blakely</u> expressed no opinion on the Federal Sentencing Guidelines, <u>see</u> <u>id.</u> at 2538, n.9 ("[t]he Federal Guidelines are not before us, and we express no opinion on them"), Stokes argues that his sentencing implicates <u>Blakely</u> in two ways.

First, the district court determined Stokes's base level to be 34, rather than 33, because the "evidence is overwhelming that he used an AK-47 during the commission of a crime of violence." United States v. Stokes, No. CRIM. 95-10379-RGS, 2000 WL 246478, at *4 (D. Mass. Feb. 28, 2000). The jury, however, never found that Stokes used the weapon during a crime of violence. The difference in base level between 33 and 34 changes the applicable guideline range from 235-293 months to 262-327 months imprisonment. Second, the district court granted an upward departure from 34 to 35 -- changing the applicable guideline range from 262-327 months to 292-365 months imprisonment -- because of the extraordinarily dangerous nature of the particular weapon and ammunition. The gun was an AK-47, with 7.62 x 39mm caliber ammunition. The jury did not find that the gun used was an AK-47, nor did it find that such a gun is extraordinarily dangerous. Stokes argues that pursuant to Blakely, these factual findings are impermissible because they were not determined by a jury or admitted by Stokes.

Stokes, however, never raised the Blakely issue in the district court or in his opening brief on appeal. Thus, we review the district court's enhancement of Stokes's sentence for plain error. United States v. Savarese, __ F.3d __, 2004 WL 2106341, at *5 (1st Cir. Sept. 22, 2004). See also United States v. Morgan, __ F.3d __, 2004 WL 1949061, at *5 (1st Cir. Sept. 2, 2004) (questioning whether plain error was even available, or whether the

-14-

issue was waived entirely, when a <u>Blakely</u> issue was neither raised below nor initially in this court).

Plain error is an extremely deferential standard; errors will be corrected only if "(1) . . . an error occurred (2) which was clear or obvious and which not only (3) affected [his] substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." <u>Id.</u> (quoting <u>United States</u> v. <u>Duarte</u>, 246 F.3d 56, 60 (1st Cir. 2001)). In applying the plain error standard after <u>Blakely</u>, we have held that no plain error occurs where the facts underlying the enhancement were undisputed. <u>Savarese</u>, 2004 WL 2106341 at *6 (holding that a defendant who did not dispute the factual basis underlying the sentence enhancement forecloses a finding of plain error).

We have also noted, and now emphasize, that any "error in sentencing should be held harmless so long as the evidence for the trial judge's factual findings is overwhelming and no reasonable jury could have disagreed with them." <u>Morgan</u>, 2004 WL 1949061 at *5 (citing <u>Sustache-Rivera</u> v. <u>United States</u>, 221 F.3d 8, 18-19 (1st Cir. 2000)). That is, if the evidence overwhelmingly proves the factual basis underlying the sentence enhancement, we will find no plain error for the judge's failure to submit the facts to a jury. We simply fail to see how a judicial finding for sentence enhancement, explicitly sanctioned by the Sentencing Guidelines,

and overwhelmingly proved at trial, would seriously affect the fairness, integrity, or public reputation of judicial proceedings. See Johnson v. United States, 520 U.S. 461, 470 (1997)(holding that the district court's failure to submit the issue of materiality to the jury was not an error that seriously affected the fairness, integrity or public reputation of judicial proceedings because the evidence supporting materiality was overwhelming and essentially uncontroverted at trial).

Here, the judge's findings -- that Stokes used an AK-47 during a crime of violence, and that such a gun is extraordinarily dangerous -- were "overwhelmingly" proven, and therefore not plainly erroneous. Evidence establish that during hot pursuit, Officer Jones noticed an AK-47 five feet from where the "shorter man's" foot had been stuck, that the shorter man was Stokes, and that the pursuit stemmed from the shooting of three individuals, one of whom died,[2] with slugs from the AK-47. Moreover, the jury -- in convicting Stokes -- necessarily had to find that Stokes possessed the same AK-47 charged in the indictment,[3] discussed in

---

[2] Stokes had disputed the "facts of [Wiggins's] murder" for sentence enhancement. Stokes was acquitted for the first-degree murder of Wiggins in state court. The district court explicitly stated that it would not consider Wiggins's murder for sentence enhancement: "a finding of responsibility for second degree murder would have no impact on Stokes's ultimate sentence." Stokes, 2000 WL 246478, at * 4.

[3] The indictment charged Stokes with possessing a "firearm, to wit: a Polytechnologies, AK-47, Model 47/S, 7/62 x 39 mm. caliber, semi-automatic rifle, bearing serial number P4705703, and

-16-

the testimony, and offered into evidence.  Since the evidence overwhelmingly proved that Stokes possessed and used a weapon (an AK-47) and ammunition (7.62 caliber) in connection with a crime of violence (the shooting of Kenneth and Bettie Pounds), the court's failure to submit this issue to the jury was not plainly erroneous; it did not seriously affect the fairness, integrity or public reputation of judicial proceedings.

Likewise, the district court did not plainly err in finding that the particular AK-47 and ammunition were "extraordinarily dangerous."  In determining the extent of an upward departure for a "weapon or dangerous instrumentality," the Sentencing Guidelines state that a court may consider the dangerousness of the weapon, the manner in which it is used (such as whether it was discharged), and the extent to which its use endangered others.  U.S.S.G. § 5K2.6.  Here, evidence establish that the weapon was a semiautomatic AK-47 with a high capacity, that the bullets fired at the Pounds's home and into the street came from this particular AK-47, and that the AK-47 was discharged at least thirteen times that evening.  The government also presented testimony -- considered by the jury in convicting Stokes -- that the AK-47 is a high-powered rifle used by the military and terrorists, and that the armor-piercing bullets were large and powerful.  Given the overwhelming evidence supporting the AK-47's

_____

ammunition, to wit: rounds of 7.62 x 39 mm. caliber ammunition."

dangerousness, we simply fail to see how the court plainly erred in finding this fact to enhance Stokes's sentence.

Although the future of the Federal Sentencing Guidelines remains uncertain, see United States v. Booker, 375 F.3d 508 (7th Cir. 2004), cert. granted, 73 U.S.L.W. 3073, 3074, 542 U.S. ___ (Aug. 2, 2004)(No. 04-104); United States v. Fanfan, 2004 WL 1723114, cert. granted before judgment, 73 U.S.L.W. 3073, 3074, 542 U.S. ___ (Aug. 2, 2004)(No. 04-105), they are not plainly invalid at present. Moreover, even if Blakely is held to apply to the Federal Guidelines, we find no basis for reversal for the reasons stated above. We therefore hold that the court did not plainly err in enhancing Stokes's sentence.

**Affirmed**.