# United States Court of Appeals
## For the First Circuit

No. 10-2363

UNITED STATES OF AMERICA,

Appellee,

v.

DAQUAWN JONES,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Lynch, Chief Judge,

Boudin and Lipez, Circuit Judges.

Rheba Rutkowski, Assistant Federal Public Defender, Federal Defender Office, for appellant.
Cynthia A. Young, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief for appellee.

July 27, 2012

**BOUDIN, <u>Circuit Judge</u>.** In the spring of 2008, federal, state and local agents began an investigation of drug activity in the Green Street area of Brockton, Massachusetts. Late in the afternoon of June 19, 2008, Massachusetts State Trooper David Patterson, working undercover, sought to purchase drugs at the corner of Lexington and Green Streets. After placing a phone call requesting two $40 bags of crack cocaine, Patterson waited for delivery of the drugs, sitting in a truck equipped with concealed audio/video recording equipment.

From his vantage across the street, Patterson could see a group of people congregated around the driveway of 249 Green Street. Eventually, a man unknown to Patterson emerged from the group and began walking towards Patterson's truck. Patterson later recalled that the man was wearing white sneakers, a black hat on backwards, a white Adidas shirt and gray sweatpants. Patterson watched the man's approach with care, wanting to be sure that he was unarmed.

As the man started to cross the street and move toward the truck, a Dodge truck that Patterson had earlier seen circling the area drove slowly by Patterson's truck. On the video recording of the events, Patterson's concern about the identity and intentions of the Dodge's driver are readily apparent. Patterson later explained that his concern was that the driver might be a police officer unaware of the operation or someone pretending to be

a police officer but aiming to rob or attack Patterson. The man advancing from the driveway also appeared to notice the truck and slowed his approach and lowered his head while waiting for the truck to pass.

After the Dodge had passed, the man who had been approaching from the driveway arrived at Patterson's vehicle, coming within 5 to 10 feet of the car, and asked "What do you want?" Patterson responded that he had $80 and wanted two $40 bags of crack cocaine. The man then went back to 249 Green Street where he conferred with the group in the driveway; he then got into a nearby car and drove away.

Shortly thereafter, a second unidentified man left the group in the driveway and walked up to Patterson's car, saying: "You want two 40's, right? Right. Two 40's. You got 80?" Patterson agreed and then exchanged the money for a bag that proved to contain crack cocaine. Patterson drove to the Brockton police station where he gave the drugs to Trooper Erik Telford and briefly gave his account of the day's events. The next day, Patterson turned over to Telford a DVD containing the video recording of the drug buy described above.

Telford was familiar with the drug trade in the area, patrolled there regularly and knew or could recognize many of the participants. In the video recording, the face of the first unidentified man is out of focus and blurry while the face of the

second unidentified man in the video can be seen quite clearly. Nevertheless, Telford (as he later testified) had no difficulty recognizing the first man as Daquawn Jones and the second as Johnny Richmond. Telford secured booking photos of the two men, showed them separately to Patterson and asked Patterson if he could identify them.

Patterson identified the photo of Jones as depicting the man who had first approached the vehicle to take the order and the photo of Richmond as the man who delivered the drugs. Patterson, of course, was not being asked to match the photos to the video but to his memory of the two men as he saw them at the time of the transaction: each had approached his truck and each had carried on a brief conversation with Patterson. It appears that neither then nor later did Patterson express any doubt or uncertainty about his identification.

Both Jones and Richmond were arrested and indicted. They were charged with conspiring to distribute cocaine base, 21 U.S.C. § 846 (2006), and with distribution (or abetting distribution, 18 U.S.C. § 2) of cocaine base within 1,000 feet of a school, 21 U.S.C. §§ 841(a)(1), 860. While Richmond pled guilty, Jones chose to go to trial. Thereafter the district court was presented with two pretrial motions to suppress or exclude evidence--one from each side--the dispositions of which are the centerpiece of Jones' present appeal.

First, Jones moved to suppress Patterson's out-of-court identification of Jones when he first identified the booking photo to Telford at the police station on the ground that it had been secured by an unduly suggestive process and was unreliable. Jones' request for suppression extended to any future in-court identification by Patterson as irrevocably tainted by the improper procedures used initially. Patterson testified at the suppression hearing describing the events recounted above.

The district court ultimately denied the motion to suppress, concluding that the identification process had been "impermissibly suggestive" (legal jargon explained below) but that the government had shown that the identification was reliable. The arguments of the parties and the district court's reasoning are described more fully in the merits discussion but at trial centered around Telford's use of a single photograph rather than an array and on the conditions of Patterson's initial look at Jones during the buy.

Also prior to trial, the government moved to exclude a proposed defense expert, Dr. Steven Penrod, from testifying. Penrod holds both Ph.D and J.D. degrees and proposed to testify about a host of issues related to eyewitness identification: the effect of stress on identification; the decreased accuracy of cross-racial compared to same-race identification (Patterson and Telford are white; Jones is black); the lack of correlation between

witness confidence and accurate identification; and the influence of suggestive identification practices.

The government's position was that identification of individuals was within the common experience of the jury, that such evidence was unnecessary and potentially misleading, and that courts commonly, although not always, reject such expert testimony. Jones' position was that the information Penrod hoped to provide defied in some respects the common knowledge of jurors and would be helpful to the jury in evaluating the weight to be given to Patterson's identification; further, Jones said, mis-identification was a critical element of his defense.

The district court granted the motion to bar the expert from testifying but its position was more nuanced than the government's.[1] In a nutshell, the court agreed that some aspects of Penrod's general concerns about stress, cross-racial identification, suggestive procedures and witness confidence would be useful information for a jury; but, the court held, these cautions were more efficiently, and with less risk of confusion, conveyed by the court's intended jury instructions, whose content and circumstances are discussed hereafter. United States v. Jones, 762 F. Supp. 2d 270, 277-78 (D. Mass. 2010).

---

[1]Before and during trial, the court explained its denial of the motion orally; it repeated the explanation, elaborating to a limited extent, in a written memorandum six weeks after Jones' sentencing. United States v. Jones, 762 F. Supp. 2d 270, 271-79 (D. Mass. 2010).

At trial, the government rested heavily on Patterson's eyewitness testimony but in addition Telford testified to his identification of Jones from the video; the jurors themselves saw the video; Brockton Police Detective George Almeida testified to Jones' regular presence in the area of the transaction in the first half of 2008, including on June 17, 2008 (two days before the transaction), when he was seen with Johnny Richmond; and the government introduced an arguably incriminating recorded telephone conversation (discussed in more detail below).

Acting on his promise, the district judge did, at Jones' request, issue relatively extensive jury instructions touching on the subjects of Penrod's proposed testimony. The most relevant part of the instructions provided that, in evaluating the identification:

> You may take into account the strength of the later identification and the circumstances under which the later identification was made. Was the identification by a witness influenced by the circumstances under which the identification was made. If you think it was you should examine that identification with great care. You want to consider the length of time or the relative shortness of the time between the first, the first observation of the person and the later identification. Was the photographic identification procedure conducted afterwards suggestive in any way. For example, an identification made when a witness chooses a photo from a group of photos tends to be more reliable than an identification made from a single photograph. It is not forbidden by the law to identify from a single photograph. But you heard the

stipulation about we don't treat police officers any different, or at least there's nothing in the manuals that say treat police officers any different. And I do tell you that it's generally believed that an identification of a person made from a group of photographs tends to be more reliable than one made from a single photograph. Now, you may rely upon this. That's left to you. I don't say anything about it. But you should understand that.

Consider these other things. You may consider these other things. What was the witness's state of mind at the time of the observation. There are studies that show that if a witness is afraid, distracted, under stress, then the witness's capacity to perceive what he says he perceives and remember it, that's reduced. Were the witness, the eyewitness witness and the person he's identifying, were they of different races. There are studies that tend to show that when a witness and the person he is identifying are of different races the identification tends to be less reliable than if both persons are of the same race. These studies reveal that even people with no prejudice against other races and people who have substantial contact with persons of other races will experience some difficulty in accurately identifying members of a different race. And quite often people don't recognize this difficulty in themselves.

Lastly, or last on this list, you can also consider that studies show that the reliability of an identification doesn't really depend upon how positive the person is. The reliability depends on all the circumstances.

Now, I make mention of studies, and fine, there are these studies and they show what I've said they show. But studies are of groups of people, a statistically significant group of people generally. They're not the people in this case. No study has been done

or could be conducted about the people in this case. And you see that's what's left to the jury. It's up to you to decide. I need you to understand the parameters, the strengths and the concerns of eyewitness testimony, but how that applies in this case is left to you under your oath as jurors.

Jones was convicted by the jury on both counts and sentenced as a career offender to 120 months' imprisonment. After Jones' appeal, we granted a partial remand of Jones' case to the district court for resentencing in light of United States v. McGhee, 651 F.3d 153 (1st Cir. 2011). The district court, withdrawing the career offender designation, imposed a new sentence of 33 months, mooting sentencing claims that Jones had originally sought to raise on the appeal.

On this appeal, Jones does not challenge the adequacy of the evidence but argues that the district court erred in refusing to suppress Patterson's identification of Jones as the participant in the drug transaction and in excluding Jones' proffered expert witness, Dr. Penrod. The first issue is fact-specific and need not detain us long; the second involves a matter of continuing importance. The standard of review depends, as usual, on the precise issue or issues and not on the general topic.

With respect to the suppression motion, it should be made clear at the outset that evidence is not normally suppressed because it is debatable or arguably unreliable--much testimony at trial is of this character--and customarily cross-examination is

the means of testing the strength of such evidence. See Perry v. New Hampshire, 132 S. Ct. 716, 723 (2012). But eyewitness identification evidence is subject to special limitations where, at a first step, the opponent establishes that it was developed in an unnecessarily suggestive manner.

It is one thing to squeeze out of the lemon whatever juice it may provide; it is another when the government itself developed the evidence and failed to take sensible and straightforward steps to ensure its reliability. Thus, where a court finds that the identification procedure used was unnecessarily suggestive, suppression is appropriate unless the government carries the burden of showing, under the totality of the circumstances, that the identification was still reliable. Manson v. Brathwaite, 432 U.S. 98, 109-14 (1977); United States v. Rivera-Rivera 555 F.3d 277, 283 (1st Cir.), cert. denied, 130 S. Ct. 344 (2009).

Here, the district court agreed with Jones that the method used to identify him was unnecessarily suggestive and that it would have imposed little if any additional burden on the police to have shown Patterson several different photographs including one of Jones. The issue on appeal is whether the judge erred in concluding that the circumstances surrounding the identification established that it was nevertheless reasonably reliable.

It is customary to say that we review the district court's findings of fact for clear error and its conclusions of law de novo, United States v. Fernandez, 600 F.3d 56, 58 (1st Cir. 2010), but the legal rules here are not in dispute and the factual circumstances are pretty well established on the record. The phrase "abuse of discretion" is often used in such cases, United States v. Brown, 510 F.3d 57, 66 (1st Cir. 2007), entailing reasonable latitude for case-specific decisions, see United States v. Bater, 594 F.3d 51, 54 n.1 (1st Cir. 2010).

Here, the district court's ruling was assuredly reasonable. Factors that courts emphasize in assessing an eyewitness' reliability include the opportunity to view the suspect at the time of the crime; the witness' degree of attention; the accuracy of the description of the defendant prior to identification; confidence at the time of identification; and the length of time elapsed between the crime and the identification. Manson, 432 U.S. at 114; Rivera, 555 F.3d at 284.

All appear to be matters of common sense, although one-- the next to last--needs rephrasing to make it so, for the witness' lack of confidence is certainly a reliable warning sign, while the presence of confidence is probably closer to a neutral factor. Anyway, anything that rationally bears on reliability is fair grist for argument; and the multiplicity of factors and variety of fact

patterns is why it makes sense to defer in some measure to the trial judge who is closest to the circumstances.

Here, the district judge noted that the transaction occurred in full daylight and that Patterson had about ten or fifteen seconds to get a good look at Jones. The judge also concluded that Patterson's degree of attention would have been high because he was a trained law enforcement officer whose job was to identify the people who sold him drugs. Concerning the Dodge truck, the district judge inferred that Patterson's concern would "heighten his attention" rather than distract him, as Jones argued. Finally, the identification was made the day after the event and not on some remote later occasion. Jones, 762 F. Supp. 2d at 273.

Jones says that Patterson had only seconds to view the suspect who kept his head down when the Dodge appeared, and could not recall identifying features about the suspect beyond his clothing. The judge's conclusion regarding the truck is debatable, of course, and depended in some measure on how he understood and evaluated Patterson's testimony; but the other points surely support the judge.

This leaves Jones with arguments, such as those his expert was prepared to develop, that Jones did in fact present to the judge and can as readily make to us without any need for the expert: that stress can hinder identification, that cross-racial identifications are often more difficult, and that a witness can be

highly confident but wrong. But in the end Paterson saw Jones face on and not far away, identified him from a photograph the next day, and his identification is clearly reliable enough to avoid exclusion under Manson and Rivera.

The standard being applied is meant to screen out only evidence that is clearly unreliable and not to supplant the jury's ordinary function of weighing what the witness says and choosing the weight to accord it. It is for this reason that "it is only in extraordinary cases that identification evidence should be withheld from the jury." United States v. de Jesus-Rios, 990 F.2d 672, 677 (1st Cir. 1993) (citations and internal quotation marks omitted). Whether the jury was given the right tools to assess the evidence is a separate question.

Penrod's testimony is urged by Jones to be one of those tools, and at the outset we note that the government did not challenge Penrod's qualifications or the reliability of the information that he sought to offer, see Fed. R. Evid. 702; Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993), but instead focused on whether his proposed testimony was within the common understanding of the jury and had the potential to confuse or mislead the jury, see Fed. R. Evid. 403, 702.

Relevant lay testimony, unless it fails the tests of Rule 403, is presumptively admissible; but expert testimony is another story. The expert is rarely a percipient witness to the events,

and sometimes (as here) expert testimony is at best helpful rather than essential; jurors cannot perform DNA analyses in the jury box but can usually make reasonable judgments about eyewitness identifications. And there can be close cases in determining the need for or importance of expert advice. See, e.g., United States v. Shay, 57 F.3d 126, 133-34 (1st Cir. 1995).

The use of experts creates costs of its own: distraction, multiplication of cost, and the loss of valuable time in stand-offs of dueling experts operating at a high level of generality. See United States v. Brien, 59 F.3d 274, 277 (1st Cir.), cert. denied, 516 U.S. 953 (1995). Understandably, trial judges tend to be cautious about opening the door to "identification" experts who, if allowed without adequate justification, would likely lead both sides to seek expert testimony in every case involving identification issues.

Still, it is untenable to argue that expert identification evidence is always and in every situation superfluous. The threshold for potential expert testimony is merely whether expert evidence can help the jury, Fed. R. Evid. 702, and while several of Penrod's basic points could be made by counsel in argument (e.g., the effects of stress), this might not be true of all. Anyway, there is obviously a difference between an attorney's appeal to common experience in closing argument and a blow-by-blow presentation by an impressive expert.

The question whether such expert evidence should be admitted has become a recurring one;[2] and, as circumstances vary from case to case, this court has declined to lay down a general rule. Brien, 59 F.3d at 277. The importance of the identification matters (it may be central, cumulative, or somewhere in between); so, too, the nature of the proposed expert testimony; and, as the district court noted, the possibilities include alternative means of providing helpful information to the jury, including the use of jury instructions.

In this instance, we agree that the identification by Patterson was of central importance; that his opportunity to see the first visitor to the car was brief and attended by some distraction and perhaps anxiety; and that information bearing on the effects of stress, witness confidence and cross-racial identification would be helpful to the jury in the present case (if supported by the relevant studies, as the district judge believed to be true). Indeed, the district judge had little hesitation in concluding that the jury would be helped by the information.

---

[2]Compare cases upholding the exclusion of expert testimony, both in this circuit, Brien, 59 F.3d at 277; United States v. Rodríguez-Berríos, 573 F.3d 55, 70-72 (1st Cir. 2009), cert. denied, 130 S. Ct. 1300 (2010), and others, e.g., United States v. Bartlett, 567 F.3d 901, 905-07 (7th Cir. 2009), cert. denied, 130 S. Ct. 1137 (2010); United States v. Lumpkin, 192 F.3d 280, 288-89 (2d Cir. 1999), with cases reversing such exclusion, e.g., United States v. Brownlee, 454 F.3d 131, 140-44 (3d Cir. 2006); State v. Clopten, 223 P.3d 1103, 1106-18 (Utah 2009).

However, it was within the district court's province to provide this information through instructions rather than through dueling experts. Penrod's proposed testimony aimed at providing background information--not an opinion about facts at issue here like the identification of a particular fingerprint or firearm. The judge was fully entitled to conclude that this general information could be more reliably and efficiently conveyed by instructions rather than through dueling experts.

Such instructions have become more common in this evolving area. E.g., American Bar Association Policy 104D: Cross-Racial Identification, 37 Sw. U. L. Rev. 917, 921-22 (2008). True, in some cases--say, identifying specific fingerprints or matching a bullet to a gun barrel--there is no substitute for testifying experts if the parties are at odds; but the kinds of general observations about weaknesses in eyewitness testimony such as those Penrod proposed to develop in this case can be provided through instructions while avoiding certain of the risks and costs of dueling experts.

Jones also contends that the exclusion of Penrod's testimony deprived him of his constitutional rights to present a meaningful defense and to present witnesses in support thereof. See Washington v. Texas, 388 U.S. 14, 17-19 (1967); Brown v. Ruane, 630 F.3d 62, 71-72 (1st Cir. 2011). But this adds little to the analysis, for converting the evidentiary claim into a

constitutional claim does not ensure admissibility of the evidence; "the right to present a defense does not trump valid rules of evidence." United States v. Pires, 642 F.3d 1, 13 (1st Cir. 2011).

While we agree that the district judge properly handled the matter in this case, the suitability of this particular set of instructions raises a separate issue. At trial, the government raised terse questions about the substance of certain of the individual instructions. Being satisfied with the outcome of the trial, however, the government on appeal has not identified individual passages in the instructions with which it may disagree and we have no occasion to consider any objections or endorse particular language.

The government was forewarned by the district court when the court excluded the defense expert that the court would deal with the subject in instructions; but while Jones tendered instructions somewhat along the lines of the instructions ultimately given, the government proposed only bland and familiar language virtually unrelated to the cautions sought by the defendant. And, at the charge conference, the government did little to help the judge tailor or soften the content. It is free in the future to argue for, and provide supporting information, in favor of different language.

Jones' final issue on appeal is his objection to the district court's decision to allow the government to introduce a

portion of a recorded telephone call between Jones and a friend that occurred on May 2, 2010, while Jones was in jail (the jury was not told of the location). The essence of the phone call is as follows:

> Jones: One of my co-d's is rattin', too, dog, that shit's got me hot.
>
> Friend: Yeah, hmmm.
>
> Jones: No doubt. When I found out . . . it's like, he's like my brother, dog. Now he's ratting.
>
> Friend: Oh, yeah?
>
> Jones: Yeah, he's a rat.

Jones objected to admission of the phone call, arguing that at the time of the call, he did not know that Richmond had pled guilty or what he had said in his plea colloquy; this had occurred roughly three weeks before the phone call but not in Jones' presence. He also argued that the phone call was highly prejudicial, Fed. R. Evid. 403, was not an admission, Fed. R. Evid. 801(d)(2), and that it would be even more prejudicial if Richmond refused to testify (which is what then occurred).

An admission is anything a party said out of court when offered against him by an adversary, Fed. R. Evid. 801(d)(2), so the only pertinent objections are relevance and undue prejudice. Relevance is obvious: the statements do not compel, but clearly permit, an inference that Jones is talking about Richmond even if it is uncertain how Jones learned of the possibility or even

-18-

whether he was mistaken.  Yes, Jones could be talking about a different rat and different crime; but his counsel was free to, and did in fact, argue weaknesses or alternative interpretations to the jury.

As to undue prejudice, his "street language" might, as Jones argues, displease the jury; but it is fairly tame, the inference of guilt is important because Jones' defense was mistaken identity, and the Rule 403 standard is weighted toward admissibility since prejudice must "substantially" outweigh probative value.  Additionally, this is a classic exercise of trial-judge discretion which is "subject to great deference," United States v. Bayard, 642 F.3d 59, 63 (1st Cir.) (citation and internal quotation marks omitted), cert. denied, 131 S. Ct. 2944 (2011), and was not here abused.

Affirmed.